1    **WO**

2    NOT FOR PUBLICATION

3

4

5                    IN THE UNITED STATES DISTRICT COURT

6                        FOR THE DISTRICT OF ARIZONA

7

8    JANE DOE, an individual; *et al.*      )    No. CV-07-1901-PHX-GMS
                                            )    No. CV-08-1837-PHX-GMS
9              Plaintiffs,                  )    (Consolidated)
                                            )
10   vs.                                    )    **ORDER**
                                            )
11                                          )
     CITY OF PHOENIX, a municipality; *et al.*)
12                                          )
              Defendants.                   )
13                                          )
     _____)

14

15         Pending before the Court is Defendants' Motion for Summary Judgment filed on July

16   6, 2009.[1] (Dkt. # 160.) For the following reasons, the Court grants the Motion with respect

17   to the § 1983 claims and dismisses the state law claims without prejudice.

18                              **BACKGROUND**[2]

19         The uncontested facts are as follows: In February 2006, Ymer Orozco ("Mr. Orozco")

20   was a California truck driver who voluntarily approached the Los Angeles Police Department

21   ("LAPD") with information about a Phoenix-based drug trafficking organization that was

22

23         _____

24         [1]Both parties have also filed several motions to either supplement or strike portions
     of the summary judgment record. These motions are discussed in Part III of this Order.

25         [2]The factual recitation contains facts supported by the record that have not been
26   challenged by either side. And, in those instances where the Court has relied on testimony
     from the Individual Officers who were involved in this case, the Court has "carefully
27   examine[d] the record" and determined that nothing calls into question the Individual
     Officers' testimony. *See Gregory v. County of Maui*, 523 F.3d 1103, 1107 (9th Cir. 2008)
28   (internal quotations and citation omitted).

affiliated with a Mexican drug cartel. Mr. Orozco advised Detective Sal Duarte ("Detective Duarte") of the LAPD that Edgar Enriquez ("Enriquez") wanted him to transport cocaine from Phoenix to Philadelphia. The LAPD then referred Mr. Orozco to the Phoenix Police Department, where he agreed to become a confidential source concerning the Enriquez drug trafficking organization.[3] Phoenix Police assigned Detective David Duron ("Detective Duron") to be the case agent for the investigation of Enriquez and his organization. Mr. Orozco then advised Detective Duron that he was supposed to meet with Enriquez on August 27, 2006 to pick up a shipment of thirty to forty kilograms of cocaine in Phoenix.

Phoenix Police assembled a team of officers that implemented a plan to intercept Enriquez and the drugs before the meeting with Mr. Orozco. Amongst others, the team included each of the individual Defendants: Detective Duron, Detective Joseph Lanzo, Officer Vincent Piano, and Officer James Rush (collectively the "Individual Officers"). The plan was designed to put Enriquez under surveillance and to prevent him from arriving at the meeting point with Mr. Orozco. Defendants thought this would allow Phoenix Police to obtain a court-ordered wiretap to gather additional information about the scope of the Enriquez drug trafficking organization and the identity of its members.

Shortly after the team placed Enriquez under surveillance, the team observed Enriquez traveling in a black Chevy Tahoe. Two patrol officers then stopped Enriquez and his traveling companion for making a right turn without using a turn signal. The officers asked Enriquez and his companion if they would accompany them to the police station for fingerprinting and photographs. Though Enriquez and his companion felt aspects of the stop were somewhat peculiar, they voluntarily decided to take the trip to the station. While Enriquez was at the station, Mr. Orozco called Enriquez's cell phone and asked where he was. This was meant to leave the impression that Mr. Orozco had no knowledge of what had

---

[3]Mr. Orozco was referred to the LAPD by the Texas Department of Public Safety. (Dkt. # 172 at ¶ 194.) As a confidential source for LAPD, Mr. Orozco provided information about the Enriquez organization as well as another drug trafficking organization. (Dkt. # 172 at ¶ 49.)

occurred. Meanwhile, two police officers broke into Enriquez's truck, seized the cocaine, and scattered some items from inside the glove compartment to make it appear that the Tahoe had been burglarized. When Enriquez was released, he returned to his truck and discovered the missing cocaine. Upon release, Enriquez also called Mr. Orozco to find out where he was. Mr. Orozco, who left Phoenix shortly after the arranged meeting time, was in Tucson when he received Enriquez's call. Following Detective Duron's advice, Mr. Orozco told Enriquez that he could not return to Phoenix because he "had a schedule to keep." (Dkt. # 172 at ¶ 104.) When pressed by Enriquez, Mr. Orozco further indicated that he would not return because he was afraid that Enriquez would "beat him up."[4] (*Id.* at ¶ 232.)

After the August 27, 2006 operation (the "August Operation"), Phoenix Police told Mr. Orozco to avoid personal contact with Enriquez and with all other members of the drug trafficking organization. (Dkt. # 172 at ¶ 119.) The Individual Officers also informed Mr. Orozco that they no longer needed him in the investigation. (Dkt. # 172 at ¶ 105.)[5] When Enriquez again contacted Mr. Orozco and asked him to transport another shipment of drugs, the Individual Officers told Mr. Orozco to quit communicating with Enriquez, and they offered to give him "fake tickets," that he could use to explain to the drug trafficking organization that he was under a lot of "heat" from police. (Dkt. # 172 at ¶ 120.) The Individual Officers and Mr. Orozco also discussed the possibility of staging an enforcement action, whereby Mr. Orozco could explain that he was unable to transport the drugs because his truck had been confiscated by police. (*Id.*)

Mr. Orozco, however, indicated that he wanted to be arrested with Enriquez to dispel the notion that he might be involved with police or with the theft of the drugs during the

---

[4]Defendants object to this statement on hearsay grounds. (Dkt. # 178, at ¶ 104.) Nevertheless, the Court need not decide whether this statement is inadmissible because Defendants are entitled to summary judgment even if the statement constitutes admissible evidence.

[5]Although Plaintiffs dispute ¶ 105 of Defendants' Statement of Facts on other grounds, they do not dispute that Phoenix Police told Mr. Orozco that they no longer needed his assistance.

August Operation. (Dkt. # 172 at ¶ 139.) Thus, even though LAPD and Phoenix Police advised Mr. Orozco against further participation (Dkt. # 172 at ¶¶ 119, 264), he decided to meet with Enriquez about transferring more drugs, and Phoenix Police agreed to participate in hopes that Mr. Orozco could bring them more information and/or arrests of the members of the Enriquez drug trafficking organization. (Dkt. # 172 at ¶ 119.)

Under the impression that Enriquez wanted him to transport another shipment of cocaine, Mr. Orozco met with Enriquez on September 30, 2006. (*See* Dkt. # 172 at ¶ 127.) Enriquez picked up Mr. Orozco at a predetermined meeting place and together they drove to a nearby pub where they discussed a second transport to take place when Mr. Orozco next traveled through Phoenix. (Dkt. # 172 at ¶ 128.) According to Enriquez, he would meet with Mr. Orozco on October 6, 2006, and then Mr. Orozco would follow Enriquez to an undisclosed warehouse and pick up between fifty and one hundred kilograms of cocaine for transport to New York. (*Id.*) After the meeting, Mr. Orozco got in touch with Detective Duron and told him about the second transport. Phoenix Police then decided to surveil Mr. Orozco's October 6, 2006 meeting with Enriquez. The Individual Officers planned to arrest Enriquez, together with Mr. Orozco, once they located the warehouse. Before this second operation (the "October Operation"), Phoenix Police also consulted with the LAPD about how to best proceed with the operation and how to best protect Mr. Orozco. The LAPD indicated that the operation might put Mr. Orozco at risk, especially if Mr. Orozco got in the same car with Enriquez. Phoenix Police subsequently promised the LAPD that they would not allow Mr. Orozco to get into the car with Enriquez. (*See* Dkt. # 172, Ex. 2 at 72.)

In preparation for the October Operation, the Individual Officers put Enriquez under surveillance and placed a GPS device on Mr. Orozco's tractor-trailer. They also had seventeen surveillance officers and a police helicopter ready if things did not go according to plan. (Dkt. # 172 at ¶ 148.) Shortly before Mr. Orozco's scheduled meeting with Enriquez, Detective Duron advised Mr. Orozco not to get into a vehicle with any members of the drug trafficking organization. (Dkt. # 172 at ¶ 145.)

While Mr. Orozco was waiting for Enriquez at a Pilot Truck Stop, he received a call from Enriquez. Enriquez advised Mr. Orozco to go outside of the truck stop and meet them along an adjacent street. When officers observed Mr. Orozco walking out of the truck stop, Detective Duron immediately called Mr. Orozco to find out what he was doing. (*See* Dkt. # 172 at ¶ 150.) Mr. Orozco told the detective that Enriquez wanted to meet him down the street. (*Id.*) At this point, Detective Duron reiterated to Mr. Orozco that "under no circumstance was he to get into the car with them." (*Id.*) Rather than heed this warning, Mr. Orozco got into Enriquez's Jeep Cherokee. (*Id.*)

Immediately after Mr. Orozco got into Enriquez's car, Officer Piano requested that a marked patrol car conduct a traffic stop. (Dkt. # 172 at ¶ 287.) Detective Duron, however, believed that there were other ways to ensure Mr. Orozco's safety; therefore, he convinced Officer Piano to delay the directive. (Dkt. # 172 at ¶ 288.) The seventeen surveillance officers and the police helicopter were then dispatched to follow the vehicle. (*See* Dkt. # 172 at 289.) After that, Detective Duron called Mr. Orozco two times to ensure that he was okay. Mr. Orozco stated during these calls that he was fine, and Detective Duron indicated that he did not detect any distress in Mr. Orozco's voice. (*See* Dkt. # 172 at ¶ 288.) Detective Duron even pulled up next to the Jeep Cherokee in an unmarked police car to check on Mr. Orozco. (*See* Dkt. # 172 at ¶ 289.) He did not notice any problems. (*Id.*)

Despite these efforts, the surveillance team lost the Cherokee in a residential neighborhood in Tempe, Arizona. (Dkt. # 172 at ¶ 294.) Sometime that night or early the next morning, Enriquez and his associate Luiz Hernandez began beating Mr. Orozco. Ultimately, they placed a plastic bag over Mr. Orozco's head, duct-taping it so that he could not breathe. (Dkt. # 172 at ¶ 295.) When officers discovered his body early the next morning, Mr. Orozco had suffocated to death. (*Id.*) Enriquez later testified that he killed Mr. Orozco because he suspected that Mr. Orozco was involved in the theft of the cocaine during the August Operation. (Dkt. # 172 at ¶ 240.)

Mr. Orozco's wife, on behalf of herself, Mr. Orozco's estate, and his surviving beneficiaries, filed a complaint asserting both federal and state claims against the City of

Phoenix, Officer Piano, Detective Duron, and Detective Lanzo. (Dkt. # 4.) The complaint alleged four causes of action: (1) violation of 42 U.S.C. § 1983; (2) negligence and/or gross negligence; (3) intentional infliction of emotional distress; and (4) wrongful death. (*Id.*) Plaintiffs then filed a separate complaint against Officer Rush, which asserted only a § 1983 claim. (Dkt. 08-CV-1837 # 1.) After the claims were consolidated, the City of Phoenix and the Individual Officers (collectively the "Defendants") moved for summary judgment with respect to all of Plaintiffs' claims. (Dkt. # 160.)

## DISCUSSION

### I. Legal Standard: Summary Judgment

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Substantive law determines which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Jesinger v. Nev. Fed. Credit Union*, 24 F.3d 1127, 1130 (9th Cir. 1994). In addition, the dispute must be genuine, that is, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). However, the moving party need not disprove matters on which the opponent has the burden of proof at trial. *Id.* at 323. Then, the burden is on the nonmoving party to establish a genuine issue of material fact. *Id.* at 322–23. The nonmoving party "may not rest upon the mere allegations or denials of [the party's] pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

### II. Analysis

For the following reasons, the Court dismisses Plaintiffs' § 1983 claims. Because no federal claims survive summary judgment, the Court dismisses Plaintiffs' state law claims without prejudice.

**A.     Defendants Did Not Violate Plaintiffs' Constitutional Rights.**

Section 1983 does not create any substantive rights; rather it is a vehicle whereby plaintiffs can challenge actions by government officials. "To state a claim for relief in an action brought under § 1983, [plaintiffs] must [allege] that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." *Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 49–50 (1999); *see* 42 U.S.C. § 1983. There is no dispute that the Individual Officers acted under color of state law. The issue before the Court is whether Defendants violated the Plaintiffs' Fourteenth Amendment due process rights.

"It is well established that the Constitution protects a citizen's liberty interest in [his or] her own bodily security." *Kennedy v. Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006). The Supreme Court, however, has instructed that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion of private actors." *Deshaney v. Winnebago County Dep't of Soc. Serv.*, 489 U.S. 189, 195 (1989). There are only two exceptions to this general rule: Under the due process clause, a government entity has an affirmative obligation to protect a person from private violence when (1) the entity has a "special relationship" with the individual, or (2) the government's affirmative act "creates the danger" through "deliberate indifference." *Id.* at 197–200; *Kennedy*, 439 F.3d at 1061. The instant case implicates neither of these exceptions.

**1.     Mr. Orozco Did Not Have a "Special Relationship" with Defendants.**

In their complaints, Plaintiffs contend that Mr. Orozco "entered into a special relationship" with Defendants when he "agreed to assist" them in the investigation. (Dkt. # 1.) However, for purposes of the government's duty to protect a person from private harm, a "special relationship" does not arise from the government's "knowledge of the individual's

predicament or from its expressions of intent to help him, but from the limitation which it imposed on his freedom to act on his own behalf." *Deshaney*, 489 U.S. at 200 (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). Accordingly, the "special relationship" exception generally is restricted to incarcerated prisoners and involuntarily committed mental health patients. *Id*. at 198–99. In fact, several circuit courts have specifically declined to extend the "special relationship" exception to confidential sources. *See, e.g.*, *Matican v. City of N.Y.*, 524 F.3d 151, 156 (2d Cir. 2008); *Velez-Diaz v. Vega-Irizarry*, 421 F.3d 71, 80 (1st Cir. 2005). The lone district court to apply the "special relationship" exception to a confidential informant only did so where police made an explicit promise to protect the informant if his status was discovered, but then directed the informant to stay in his home as a "virtual prisoner" when his status was discovered. *See G-69 v. Degnan*, 745 F. Supp. 254, 257 (D. N.J. 1990).

In the instant case, Mr. Orozco was neither incapacitated nor involuntarily institutionalized. Mr. Orozco's participation in the investigation was voluntary. (Dkt. # 172, Ex. 2, at 82.) He voluntarily approached authorities, and Defendants never restricted Mr. Orozco's individual "freedom to act on his own behalf." *See Deshaney*, 489 U.S. at 200. And, unlike the informant in *Degnan*, there is no evidence that Defendants promised Mr. Orozco protection or held him as a "virtual prisoner." *See* 745 F. Supp. at 257. As a matter of law, Mr. Orozco did not form the requisite "special relationship" with Defendants by agreeing to act as a confidential source in their drug investigation.

**2. Defendants Did Not "Create the Danger" by Acting with "Deliberate Indifference."**

Next, Plaintiffs allege that Mr. Orozco's due process rights were violated because the government's conduct affirmatively created a danger to Mr. Orozco that "he . . . would not have otherwise faced." *See Johnson v. City of Seattle*, 474 F.3d 634, 639 (9th Cir. 2007). To prevail on this claim, Plaintiffs must demonstrate that (1) affirmative conduct on the part of the government created a dangerous situation, and (2) that the state official acted with

deliberate indifference in subjecting the plaintiff to the danger. *See Huffman v. County of L.A.*, 147 F.3d 1054, 1061 (9th Cir. 1998) (internal citations omitted).

### a.     State-Created Danger

First, the Defendants' affirmative conduct does not give rise to liability under the state-created danger exception. To prevail under this exception, Plaintiffs must demonstrate that "'the state action affirmatively place[d]'" Mr. Orozco "'in a position of danger' . . . which he . . . would not have otherwise faced." *Johnson*, 474 F.3d at 639 (quoting *Kennedy*, 439 F.3d at 1061). In other words, the state action must do more than simply expose an individual to danger that already exists. *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996). In the context of confidential sources, the affirmative state action must create or increase the risk of danger beyond the risk that the source voluntarily chooses to encounter. Because criminal operations such as drug trafficking organizations are extremely dangerous, confidential sources inherently take on the risk that their status will be exposed. This inherent risk, however, does not require the state to become an insurer of an informant's life. Hence, the government does not violate a confidential source's due process rights unless government actors create or increase the risk of danger beyond those risks that the informant knowingly and voluntarily undertakes. *See Gatlin v. Green*, 362 F.3d 1089 (2004); *see also Johnson*, 474 F.3d at 640.[6]

The instant case is similar to the Eighth Circuit's recent decision in *Gatlin*, 362 F.3d at 1091, where a former gang member voluntarily agreed to encounter known risks by electing to be a government informant in a murder investigation. Based on the informant's

---

[6]The Ninth Circuit has addressed the state-created danger exception in various contexts. *See, e.g.*, *Johnson*, 474 F.3d at 634. The Court, however, is unaware of any Ninth Circuit authority where the exception has been applied to a confidential source, such as Mr. Orozco. Accordingly, the legal standard in this case is drawn from Ninth Circuit case law addressing the exception in other contexts, *see, e.g.*, *id.*, as well as from authority from those circuits that have specifically addressed the state-created danger with respect to confidential sources. *See, e.g.*, *Butera v. District of Columbia*, 235 F.3d 637, 651 (D.C. Cir. 2001) (holding that state-created danger exception might apply to a confidential source when state "officials increase or create the danger that ultimately results in . . . harm" to the informant).

official statement to Minneapolis police, officers apprehended an active member of the gang who was suspected of murder. *Id.* While he was awaiting trial, this gang-member learned that the informant had left the gang and had assisted police. *Id.* The gang-member then sent a letter to other members of the gang containing a transcript of the informant's police statement along with a note stating, "Check this out. Something must be done about this." *Id.* The letter and its contents were discovered by police in a routine check of the gang-member's mail, but rather than confiscate or destroy the letter, police placed it back in the outgoing mail. *Id.* at 1092. The police officers in *Gatlin* then warned the informant about the increased risk, offered to place him in witness protection, and provided financial assistance to help him to relocate to another state. *Id.* Rather than heed these warnings, however, the informant chose not to relocate, and he was tragically killed by gang-members shortly thereafter. *Id.* at 1093. In a subsequent claim against the officer who released the letter, the Eighth Circuit held that there was no violation of the informant's constitutional rights. *Id.* Breaking the link between the officers' actions and the informant's death was the fact that the informant chose not to relocate despite the increased risk. *Id.* The informant "knowingly assumed a considerable risk that . . . gang members would . . . seek to avenge him" for his cooperation with police. *Id.* By choosing to "remain or return to Minneapolis," the informant "miscalculated the grave risk of harm he assumed." *Id.*

The Sixth Circuit has similarly held that a state actor is only liable under § 1983 to a confidential source when the actor *substantially* increases the danger to the source or informant. *See Summar v. Bennett*, 157 F.3d 1054, 1060 n. 2 (6th Cir. 1998). In *Summar*, the court denied relief to the family of a murdered informant even though the state official had publicly disclosed the confidential source's identity. The court denied relief because the official's conduct "did not *substantially* increase the likelihood that a private actor would deprive [the informant] of his liberty interest in personal security." *Id.* Instead, the informant's "voluntary decision to become a confidential informant with all the dangers it presented . . . played a much greater role in his unfortunate demise." *Id.* (emphasis added).

Only one court has imposed liability on police for increasing the danger to a confidential source, and that court only imposed such liability under circumstances that rendered the source's participation both unknowing and involuntary.[7] *See G-69 v. Degnan*, 745 F. Supp 254 (D. N.J. 1990). In *Degnan*, the District of New Jersey held that police violated an undercover informant's constitutional rights when they reneged on their promise to protect the informant if his identity was ever discovered. *Id.* at 265. The Court found that the police created the danger because they "induced" the informant's participation by promising protection and a new identity, but then failed to keep the promise when the informant's status was compromised. 745 F. Supp at 265. In other words, the court found the police liable under the state-created danger exception because the informant would not have *voluntarily* participated if he had *known* that the police would break their promise to provide protection. *See id.*[8]

Even assuming the Individual Officers in this case conducted the August Operation in a manner that created or increased the risk of private harm to Mr. Orozco, they did no more than the officer in *Gatlin* who placed the letter identifying the confidential informant back in the outgoing mail. Phoenix Police conducted a suspicious traffic stop, proceeded to arrest Enriquez for failure to use a turn signal, and then took the cocaine from Enriquez's Chevy Tahoe. The seizure of the drugs, Plaintiffs argue, may have cast suspicion on Mr. Orozco because few people knew that the drugs were in transit and he was the "new guy" in

---

[7]The Northern District of Illinois has also held that a government official could be held liable for creating or increasing the danger to a confidential source who was intoxicated when officers recruited him to participate in a drug investigation. *See Dykema v. Skoumal*, 1999 WL 417360 at * 5 (N.D. Ill. June 10, 1999). Although the district court found that such facts were sufficient to survive a motion to dismiss, the court's later refusal to grant summary judgment in favor of the government official was reversed by the Seventh Circuit. *See Dykema v. Skoumal*, 261 F.3d 701, 706 (7th Cir. 2001).

[8]The exact basis for the court's conclusion in *Degnan* is not entirely clear. While the court indicates that the government's conduct increased the danger to the confidential informant, the Court also seems to rely on the "special relationship" exception in finding a due process violation. *See Degnan,* 745 F. Supp. at 265.

the organization. (Dkt. # 171 at 13.) At oral argument, Plaintiffs' counsel also asserted that Mr. Orozco was unaware that Phoenix Police planned to seize the drugs from Enriquez's truck during the August operation. Plaintiffs contest that this assertion creates a question of fact as to whether Mr. Orozco's participation in the August Operation was knowing and voluntary.[9]

Even if the Court determined that there was a question as to whether Mr. Orozco knowingly participated in the August Operation, the Court still finds that the Individual Defendants did not create or increase the danger that took Mr. Orozco's life because Mr. Orozco knowingly and voluntarily consented to any increased risk by participating in the October Operation. In *Gatlin*, the officer also increased suspicion about the informant when he placed the letter identifying the confidential informant back in the outgoing mail. *See* 362 F.3d at 1092. Similarly, the official in *Summar* publicly disclosed the confidential informant's status. 157 F.3d at 1060 n. 2. And, while neither of these government actors obtained knowing and voluntary consent from the confidential source before they took these provocative actions, the Eighth and Sixth Circuits determined that the officers did not violate the confidential source's due process rights because the informants chose to voluntarily face the increased risk resulting from the officers' conduct. *See Gatlin*, 362 F.3d at 1092; *Summar*, 157 F.3d at 1060 n. 2. Hence, any significant link between the officers' actions in the August Operation and Mr. Orozco's death was severed by the uncontested fact that Mr. Orozco knowingly and voluntarily chose to continue participating in the investigation despite the increased risk. *See Gatlin*, 362 F.3d at 1092; *Jones v. Reynolds*, 438 F.3d 685, 694 (6th

---

[9]While Plaintiffs raised this point at oral argument, they never addressed this argument or even asserted facts that might support the argument in their opening brief or their separate statement of the facts. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001) ("[i]ssues that are not specifically and distinctly argued and raised in a party's opening brief are waived.") (citing *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1110 n. 1 (9th Cir. 2000)).Plaintiffs also fail to cite any portion of the record to support this allegation. Nevertheless, because Defendants do not present any evidence to contest this allegation, the Court will consider it for the purposes of the Motion for Summary Judgment.

Cir. 2006) (holding that any connection between police misconduct and a plaintiff's death was broken by plaintiff's voluntary decision to place herself in harm's way).

Indeed, much like the informant in *Gatlin* who returned to his old gang's neighborhood despite the increased risk, Mr. Orozco "knowingly assumed the considerable risk" that the drug trafficking organization "would seek to avenge him" when he chose to continue with the second operation. *See* 362 F.3d at 1093. After the August Operation, several officers warned Mr. Orozco about the increased risk. Detective Durate advised Mr. Orozco against participating in the second operation. (Dkt. # 172 at ¶ 264.) Detective Duron told Mr. Orozco that his assistance was no longer necessary and instructed him to cease all personal contact with the drug trafficking organization. (Dkt. # 172 at ¶ 119.) Rather than heed Defendants' advice to extricate himself, Mr. Orozco requested further involvement and made the decision to participate in the October Operation. (Dkt. # 172 at ¶ 120.) When Detective Duron instructed Mr. Orozco not to get into Enriquez's vehicle under any circumstances, Mr. Orozco got in the car anyway. (Dkt. # 172 at ¶¶ 145, 150.) And, while Plaintiffs allege that Mr. Orozco was "naive" and "inexperienced," this allegation is insufficient to establish that Mr. Orozco acted unknowingly. (Dkt. # 172 at ¶ 196-198.) Mr. Orozco was warned on multiple occasions that drug trafficking organizations can be extremely dangerous. He was also advised by several officers, including Detective Duarte, to cease any further involvement with the investigation. (Dkt. # 172 at ¶ 264.) Accordingly, no reasonable fact-finder could determine that Mr. Orozco was so "naive" or "inexperienced" to render his decision "unknowing" with respect the danger he faced.

Furthermore, it is uncontested that Mr. Orozco acted voluntarily. Prior to the October Operation, Mr. Orozco repeatedly asked to continue participating in the investigation and he voluntarily answered several telephone calls from Enriquez. A few days before the operation, Mr. Orozco indicated that he was not afraid of Enriquez and that he felt comfortable with

him. (Dkt. # 161, Ex. 1 at PPD 1284.)[10] Then, on the day of that operation, Mr. Orozco made the volitional decision to meet with Enriquez as a confidential source for Phoenix Police. It is also undisputed that during the October Operation, Mr. Orozco got up from his seat at the designated meeting place, he walked down the street towards Enriquez's car, and then seated himself in that car. Just moments before he approached and entered Enriquez's car, Detective Duron told Mr. Orozco not to get in the car. Here, all of the evidence demonstrates that Mr. Orozco made the decision on his own volition and in direct contradiction of Detective Duron's directive. (Dkt. # 172 at ¶ 150.)

Furthermore, Plaintiffs' argument that Mr. Orozco was compelled to participate in the October Operation is without support in the record. Here, Plaintiffs argue that Mr. Orozco only participated in the second operation because he believed that he had no choice -- otherwise he would expose himself and his family to further danger. To support this argument, Plaintiffs direct the Court's attention to a telephone conversation between Mr. Orozco and Detective Duron that occurred on September 30, 2006:

> Detective Duron: so you are saying that the only way to get out of this is that you have to be arrested with them (Enriquez)?
>
> Mr. Orozco: you guys have to arrest me together with them . . . . and when I'm in jail with them, then you can say, you have to go . . .
>
> Detective Duron: that you have a warrant for your arrest . . .
>
> Mr. Orozco: eh huh . . . then you get me out . . . and everything (sic) done . . . .

(Dkt. # 172 at ¶ 17.) This conversation, however, does not demonstrate that Mr. Orozco's participation in the October Operation was somehow involuntary. And, even if Mr. Orozco decided to go through with the second operation against the officers' advice to protect himself from the consequences of the first operation, it was still Mr. Orozco's decision to

---

[10]These statements come from a transcript of a recorded conversation between Mr. Orozco and Detective Duron, and Plaintiffs do not contest its admissibility.

undertake the second operation. This was a decision that Phoenix Police and LAPD counseled against, both in general (do not participate in the second operation) and more specifically (do not get in the car under any circumstances). (Dkt. # 172 at ¶¶ 150, 151, 154.) By choosing to participate in the second operation and getting into Enriquez's car, Mr. Orozco "miscalculated the grave risk of harm he assumed" *See Gatlin*, 362 F.3d at 1093; *see also Johnson*, 474 F.3d at 640 (holding that state-created danger exception did not apply to plaintiffs that "voluntarily placed themselves in the midst" of harm); *Jones v. Reynolds*, 438 F.3d 685, 694 (6th Cir. 2006) ("When a victim bears some responsibility for the risks she has incurred, it is even more difficult to say that the 'state' has 'created' the 'danger' to her by its affirmative acts.").

Despite Mr. Orozco's decision to enter Enriquez's car, Plaintiffs also assert that Defendants created the danger *through their failure to stop* Mr. Orozco from participating in the investigation or *through their failure to prevent* him from leaving in the drug traffickers' car. This, however, cannot be the basis for applying the state-created danger doctrine because the Defendants' failure to act does not impose liability under § 1983. *See Johnson*, 474 F.3d 634, 641 (9th Cir. 2007). Defendants' failure to stop Mr. Orozco simply is not an affirmative act. *See Penilla v. City of Huntington Park*, 115 F.3d 707, 710 (9th Cir. 1997).

Nevertheless, even if Mr. Orozco did not know that the Individual Officers planned to take the cocaine from Enriquez's truck during the August Operation, and even if Mr. Orozco's subsequent voluntary consent to the October Operation is insufficient to overcome his alleged lack of knowledge during the first operation, summary judgment is still appropriate because Defendants' conduct does not constitute deliberate indifference. Therefore, even if there is a genuine issue of material fact as to whether the Individual Officers created or increased the risk of harm to Mr. Orozco, Defendants did not violate Mr. Orozco's due process rights because the Defendants did not act with deliberate indifference.

**b.    Deliberate Indifference**

Plaintiffs fail to present sufficient evidence demonstrating deliberate indifference. To establish that a defendant acted with deliberate indifference to a danger they allegedly created, a plaintiff must satisfy "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his actions." *Bryan County v. Brown*, 520 U.S. 397, 410 (1997). To show that state officials acted with deliberate indifference to a danger they created, a plaintiff must demonstrate "(1) an unusually serious risk of harm . . . , (2) [state officials'] actual knowledge of (or at least, willful blindness to) that elevated risk, and (3) [state officials'] failure to take obvious steps to address that known, serious risk." *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996).

Even if Defendants' conduct during the initial operation increased the risk of danger to Mr. Orozco, they did not act with deliberate indifference in doing so. Here, Plaintiffs direct the Court's attention to several of the Defendants' actions that occurred both before and after the initial operation. These actions, however, are insufficient to satisfy the high standard necessary to demonstrate deliberate indifference as nothing suggests that Defendants "disregarded a known or obvious consequence of [their] actions." *See Bryan County*, 520 U.S. at 410.

First, Plaintiffs assert that the Individual Officers acted with deliberate indifference because they conducted the August Operation in a way that was likely to expose Mr. Orozco's involvement in that operation. (Dkt. # 171 at 14.) Plaintiffs argue that the Individual Officers knew or should have known that by seizing the drugs from the truck, Enriquez would suspect Mr. Orozco and target him and his family for the theft. Yet, assuming that the Phoenix Police knew that Enriquez might suspect Mr. Orozco, their conduct during the August Operation did not amount to deliberate indifference because the officers' actions were not unreasonable in light of the facts that were available to them at the time of the operation. Indeed, prior to the August Operation, Phoenix Police did not know that Enriquez had been to the Orozco home or that Enriquez had provided him with a tractor-trailer. In fact, Mr. Orozco specifically told the Individual Officers that Enriquez and other members of the drug-trafficking organization did not know where Mr. Orozco and his family

lived. (*See* Dkt. # 172 at ¶ 121.) Phoenix Police did not find out that Enriquez loaned Mr. Orozco money to buy a new tractor-trailer for transporting drugs until after the operation.[11] (*See* Dkt. # 172 at ¶ 52; ¶ 90.) And, even if Phoenix Police knew or should have known that the August Operation might increase Enriquez's suspicion, they reasonably believed that Mr. Orozco could avoid future contact with the organization on the basis of their understanding that the drug traffickers did not know where Mr. Orozco lived and had not otherwise provided him with a trailer that would tie him into the organization. Accordingly, it cannot be said that Defendants were deliberately indifferent with respect to the manner in which they conducted the August Operation since Mr. Orozco concealed or failed to provide material facts that may have altered the manner in which Phoenix Police conducted the August Operation.

Plaintiffs also assert that Defendants were deliberately indifferent because they decided to go forward with the October Operation despite warnings from the LAPD that Mr. Orozco's status as a confidential source may have been compromised by the August Operation. (Dkt. # 168 at 15.) By going forward with the operation, Defendants did not display "actual knowledge of" or "willful blindness to" the danger surrounding Mr. Orozco. *See Grubbs*, 92 F.3d at 900. Just days before the operation, Defendants surveilled a meeting between Mr. Orozco and Enriquez; nothing during that meeting suggested to Defendants or Mr. Orozco himself that Enriquez presented a heightened danger to Mr. Orozco. (Dkt. # 172 at ¶ 127.) Thus, even if the officers had knowledge of the increased risk, Plaintiffs simply do

---

[11]At oral argument, Plaintiffs asserted that the LAPD knew about the purchase of the tractor-trailer before the August Operation. The portion of Officer Duarte's deposition, which is cited to support this assertion, however, does not indicate that police knew about the purchase of the trailer. (*See* Dkt. # 173 Ex. 2 at 43.) Instead, this portion of the record merely supports the notion that Mr. Orozco indicated that the traffickers wanted to buy him a new tractor-trailer and that the officers advised Mr. Orozco not to accept a truck or a trailer from the drug-traffickers because it would be used as a tool to "have a better hold on [him]." (*Id.*) In fact, Officer Duarte specifically testified, "I can't say for certain if they got [the trailer] for him or if they bought it or if he purchased it on his own." (*Id.*) Yet, even if Plaintiffs had presented evidence demonstrating that *LAPD* knew about the trailer, there is nothing to suggest this knowledge should be imputed to *Phoenix Police*.

not provide sufficient factual support to demonstrate that the Individual Officers failed to "[take] obvious steps to address the known serious risk." In fact, Defendants advised Mr. Orozco that they didn't want him to go forward with the operation. They also set up a seventeen member surveillance team with a helicopter to monitor the operation and assist Mr. Orozco in case something went wrong.

Next, Plaintiffs assert that Defendants acted in a deliberately indifferent manner because they breached a promise to the LAPD that they would not allow Mr. Orozco to get into Enriquez's car. (Dkt. # 168 at 15.) Here it is unclear why a breach of promise to the LAPD would constitute deliberate indifference towards Mr. Orozco. There is no dispute that Defendants attempted to stop Mr. Orozco from getting into Enriquez's car and took subsequent actions to limit the risk of harm to Mr. Orozco. *See Grubbs* 92 F.3d at 900. Detective Duron told Mr. Orozco not to get into the car with Enriquez under any circumstances. After Mr. Orozco got in the car, the surveillance team, which included a helicopter, continued to track Mr. Orozco as he traveled in Enriquez's car. Defendants called Mr. Orozco's cell phone twice and pulled up next to Enriquez's car to see if Mr. Orozco was under duress. While it is true that Detective Duron countermanded the instruction to stop Enriquez with a marked patrol car, Plaintiffs do not show that the Defendants failed to take "obvious steps" to protect Mr. Orozco. Defendants' actions illustrate that they took concerted steps to protect their confidential source. Furthermore, the Court is very hesitant to "dictate to police how best to protect themselves and public, especially when [the Court's] ruling could be taken to require officers to use riskier methods than their professional judgment demands." *See Matican v. City of N.Y.*, 524 F.3d 151 (2d Cir. 2008) (holding that police officers did not act with deliberate indifference in planning a sting operation with confidential source who was ultimately killed).

Finally, Plaintiffs argue that Defendants were deliberately indifferent because they did not provide Mr. Orozco with an exit plan during or after the initial operation in August 2006. (*See* Dkt. # 172 at ¶ 261.) The record, however, demonstrates that Defendants provided Mr. Orozco with at least two options for ending his involvement. Specifically, Detective Duron

gave Mr. Orozco some fake traffic citations so that he could show Enriquez that he had been stopped by police and suggested that Mr. Orozco use them to explain that he was under a lot of "heat" from police and did not want to bring it down on the drug trafficking organization. (Dkt. # 172 at ¶ 120.) Detective Duron and Mr. Orozco also discussed the possibility of staging a fake enforcement action whereby Mr. Orozco could explain to Enriquez that police had confiscated his truck. (*Id.*)

Thus, viewing the facts in the light most favorable to the Plaintiffs, the Court finds that Defendants did not act deliberately and indifferently toward Mr. Orozco. It simply cannot be said that Defendants knew or should have known that Mr. Orozco would be harmed, but did nothing to prevent the harm. *See Grubbs*, 92 F.3d at 900.[12]

### 3. Because Defendants Did Not Violate Mr. Orozco's Due Process Rights, Summary Judgment is Appropriate on Plaintiffs' Other Federal Claims.

Defendants are also entitled to summary judgment with respect to plaintiffs' § 1983 claims for loss of familial association. While it is clearly established that a child possess a constitutionally protected liberty interest in the companionship and society of his or her parent, *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 371 (9th Cir. 1998), the right to familial association can only be violated if there is an underlying due process violation. *See, e.g.*, *Lee v. City of L.A.*, 250 F.3d 668, 685 (9th Cir. 2001) ("[T]he state's interference with [the right of familial association] *without* due process of law is remediable under 42 U.S.C. § 1983.") (quoting *Kelson v. City of Springfield*, 767 F.2d 651, 654–55 (9th Cir. 1982) (internal quotation marks omitted). As discussed in the previous section, the undisputed facts demonstrate that Plaintiffs are unable to demonstrate that Defendants'

---

[12]The Eighth Circuit in *Gatlin* also recognized in their holding that the officers' decision to release the letter identifying the informant could not result in a cognizable due process violation because "the officers subsequently provided the informant with the "means necessary to flee his would-be avengers."*Gatlin*, 362 F.3d at 1093. As discussed above, Defendants in this case took subsequent action to provide Mr. Orozco with various means to help him avoid the increased danger.

violated Mr. Orozco's due process rights. And, as such, summary judgment is appropriate on Plaintiffs' claims for loss of familial association.

**4.      Even Had the Individual Officers Violated Mr. Orozco's Due Process Rights and Plaintiffs' Rights to Familial Association, the Individual Officers Would Be Entitled to Qualified Immunity.**

In determining whether a state actor is entitled to qualified immunity, the Court first asks whether the plaintiff has made a *prima facie* showing that the state actor violated plaintiff's constitutional rights. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Orin v. Barclay*, 272 F.3d 1207, 1214 (9th Cir. 2001). If the facts alleged show a constitutional violation, the Court next determines whether the law was clearly established. *Saucier*, 533 U.S. at 201. A right is "clearly established" if its "contours" are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Finally, if the law was clearly established, but the state actor made a reasonable mistake regarding what the law required, the officer will be entitled to immunity. *Saucier*, 533 U.S. at 205.

Even if the Individual Officers committed a constitutional violation in this case, it was not clearly established in October 2006 that their conduct violated Mr. Orozco's due process rights. While the state-created danger was "clearly established" at that time, *see Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1066 (9th Cir. 2006), neither the Ninth Circuit nor the Supreme Court had ever applied the state-created danger exception in a confidential source case. And, even though, "the specific, alleged conduct in this case need not have been previously and explicitly deemed unconstitutional," existing case law *had not* made it clear that the Individual Officers' conduct violated constitutional norms. *See id.* at 1065–66. Ninth Circuit cases have only found government officials liable under the state-created danger exception when the plaintiffs or decedents were unwilling victims, who were involuntarily subjected to a dangerous situation without warning from the state actors. *See, e.g.*, *Kennedy*, 439 F.3d at 1055; *Munger v. City of Glasgow Police Dep't.*, 227 F.3d 1082 (9th Cir. 2000); *Penilla v. City of Huntington Park*, 115 F.3d 707 (9th Cir. 1997); *Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989), *cert. denied*, 489 U.S. 938 (1990). In *Johnson v. Seattle*, the Ninth

Circuit even held that there was no due process violation where "[p]laintiffs voluntarily placed themselves in the midst" of private harm. 474 F.3d 634, 640 (9th Cir. 2007).

Moreover, those circuits that had addressed the state-created danger doctrine in the context of confidential sources had uniformly found that liability under § 1983 was inappropriate. *See, e.g.*, *Butera v. Dist. of Columbia*, 235 F.3d 637, 654 (D.C. Cir. 2001) ("[T]o date no circuit has applied the State endangerment concept where an arguably voluntary informant . . . was involved. This lack of clarity in the law of the circuits leads us to conclude that no reasonable police officer would have known that his or her actions were subject to the state endangerment limitation."); *Velez-Diaz v. Vega-Irizarry*, 421 F.3d 71, 81 (1st Cir. 2005); *Gatlin v. Green*, 362 F.3d 1089, 1093–94 (8th Cir. 2004); *Dykema v. Skoumal*, 261 F.3d 701, 706 (7th Cir. 2001); *Summar v. Bennett*, 157 F.3d, 1054, 1059 (6th Cir. 1998).

Thus, even if Individual Officers acted unconstitutionally, it cannot be said that a reasonable public official would clearly have known that the officers' conduct was prohibited with respect to the uncontested facts presented here.

### 5. Plaintiffs Have Not Established Municipal § 1983 Liability Against the City of Phoenix

A municipality is liable under § 1983 only if "the municipality *itself* causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (citing *Monell v. N.Y. City Dept. of Soc. Servs.*, 436 U.S. 658, 694–95 (1978). A municipality "is not vicariously liable under § 1983 for the constitutional torts of its agents . . . ." *Collins v. City of Harker Heights*, 503 U.S. 115, 123 (1992). Instead, a municipality is only liable "when it can be fairly said that the city itself is a wrongdoer." Thus, to prevail against the City of Phoenix in this case, Plaintiffs must demonstrate that (1) a municipal employee violated the plaintiff's constitutional rights, (2) the City has "customs or polices that amount to deliberate indifference," and (3) "these polices were the moving force behind the [Officers'] violation of [Plaintiffs'] constitutional rights, in the sense that the [City] could have prevented the

violation with an appropriate policy." *Gibson v. County of Washoe*, 290 F.3d 1175, 1193–94 (9th Cir. 2002).

These required elements are not present in this case. As discussed above, no municipal employees violated the Plaintiffs' constitutional rights. This alone is sufficient to insulate the City from liability under § 1983. *See City of L.A. v. Heller*, 475 U.S. 796, 799 (1986); *Scott v. Henrich*, 39 F.3d 912, 916 (9th Cir. 1994) ("While the liability of municipalities doesn't turn on the liability of individual officers, it is contingent on a violation of constitutional rights."). Accordingly, the Court need not address whether the City's policies, practices, and customs have "significant constitutional implications," as alleged by the Plaintiffs. (Dkt. # 168 at 17.) Without an underlying constitutional violation, Plaintiffs cannot prevail against the city under § 1983.

## B.  Court Need Not Address Defendants' Other Arguments for Summary Judgment

In their Motion for Summary Judgment, Defendants also assert that Plaintiffs are neither entitled to punitive damages nor damages for pre-death pain and suffering for the alleged violations of § 1983. (Dkt. # 160 at 16–17.) The Court need not address these issues because there can be no damages under § 1983 where there is no underlying constitutional violation.

## C.  Plaintiffs Remaining State Claims Are Dismissed Without Prejudice

Because none of the federal claims survive summary judgment, the Court dismisses Plaintiffs' state claims against the City of Phoenix for negligence, gross negligence, intentional infliction of emotional distress, and wrongful death. When a federal court "dismisses [federal claims] leaving only state claims for resolution, the court should decline jurisdiction over the state claims and dismiss them without prejudice." *Les Shockley Racing Inc. v. Nat'l Hot Rod Ass'n*, 844 F.2d 504, 509 (9th Cir. 1989). Only in the "unusual case" should federal courts retain jurisdiction over the state law claims. *Gini v. Las Vegas Metro. Police Dept.*, 40 F.3d 1041, 1046 (9th Cir. 1994). Here, Plaintiffs do not allege any reason

why this case is uniquely appropriate for federal jurisdiction; thus, dismissal without prejudice is appropriate.

**III.    The Parties' Other Pending Motions**

Also pending before the Court are Defendants' Motion to Strike Portions of Plaintiffs' Separate Statement of Facts (Dkt. # 178 at 35), Plaintiffs' Motion to Supplement their Statement of Facts with Five Pages Inadvertently Omitted from their Exhibits (Dkt. # 179), Plaintiffs' Motion to Supplement the Summary Judgment Record (Dkt. # 185), and Defendants' Motion to Strike the Plaintiffs' Request to Supplement the Summary Judgment Record (Dkt. # 186).

Defendants' Motion to Strike Portions of Plaintiffs' Separate Statement of Facts (Dkt. # 178 at 35) is denied as moot because the Defendants are entitled to summary judgment even if the contested portions of Plaintiffs' Separate Statement of Facts are admitted. The Court grants Plaintiffs' unopposed Motion to Supplement their Statement of Facts with Five Pages Inadvertently Omitted from their Exhibits (Dkt. # 179) as this Motion is unopposed and appears to have been submitted in good faith. Next, the Court grants Defendants' Motion to Strike the Plaintiffs' Motion to Supplement the Summary Judgment Record (Dkt. # 186) because nothing in the Federal Rules of Civil Procedure authorize Plaintiffs' supplement. *See* Fed. R. Civ. P. 56(c), 56(e). In this case, the evidence contained in the supplement was available at the time of briefing and prior to oral argument. *See Peterson v. Scotia Prince Cruises Ltd.*, 328 F. Supp. 2d 119, 120 (D. Maine 2004) (denying plaintiff's motion for leave to supplement the record where the supplement was "simply a late effort to do what she should have done in responding to the initial summary judgment motion"). In addition, Plaintiffs have failed to demonstrate "excusable neglect" for failing to submit this evidence earlier in these proceedings. *See* Fed. R. Civ. P. 6(b)(1)(B).

## CONCLUSION

Plaintiffs' § 1983 claims fail against each of the Defendants in this case. Because only Plaintiffs' state law claims remain, the Court dismisses Plaintiffs' state law claims without prejudice.

**IT IS THEREFORE ORDERED:**

(1) Defendants' Motion for Summary Judgment (Dkt. # 160) is **GRANTED IN PART**, with respect to all claims arising under 42 U.S.C. § 1983.

(2) Plaintiff's state law claims for Negligence, Gross Negligence, Intentional Infliction of Emotional Distress, and Wrongful Death are **DISMISSED WITHOUT PREJUDICE**.

(3) Plaintiffs' Motion to Supplement their Statement of Facts with Five Pages Inadvertently Omitted from Exhibits (Dkt. # 179) is **GRANTED**.

(4) Defendants' Motion to Strike Portions of Plaintiffs' Separate Statement of Facts (Dkt. # 178 at 35) is **DENIED** as moot.

(5) Defendants' Motion to Strike Plaintiffs' Request to Supplement the Summary Judgment Record (Dkt. # 186) is **GRANTED**.

(6) Plaintiffs' Motion to Supplement the Summary Judgment Record (Dkt. # 185) is **DENIED** as moot.

(7) The Clerk of the Court is directed to **TERMINATE** this matter.

DATED this 24th day of November, 2009.

_____
G. Murray Snow
United States District Judge